CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
FEB 02 2007
JOHN F. CORCORAN, CLERK
BY: /s/ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:06CR00029-10 |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| ANTHONY WADE GOOD, | ) | |
| | ) | |
| | ) | By: B. WAUGH CRIGLER |
| Defendant. | ) | U.S. MAGISTRATE JUDGE |

In accordance with the provisions of Title 28 U.S.C. § 636(b)(3) and upon the defendant's consent, this case was referred to the undersigned to conduct a plea hearing.

**DEFENDANT'S RESPONSES TO RULE 11 INQUIRY**

The Grand Jury has returned a multiple count Superseding Indictment ("Indictment") charging defendant in Count One with willfully and knowingly combining, conspiring, confederating and agreeing with persons known and unknown to the Grand Jury, to commit the following offenses against the United States, to wit: to distribute and possess with intent to distribute a mixture or substance containing more than fifty (50) grams of cocaine base, that being crack, a Schedule II narcotic controlled substance in violation of Title 21, United States Code, Section 841(b)(1)(A), all in violation of Title 21, United States Code, Section 846. In the lesser included offense of Count One of the Indictment, the defendant is charged with conspiring to possess with the intent to distribute and to distribute more than five (5) grams or more of a mixture or substance containing cocaine base, also known as "crack cocaine".

On January 26, 2007, a plea hearing was conducted before the undersigned, and the defendant entered a plea of guilty to a lesser included offense of Count One of the Indictment pursuant to a plea

agreement[1] between defendant and the government. At this hearing the defendant was placed under oath and testified that his full legal name is Anthony Wade Good, he was born on May 13, 1968, and he attended high school up to the twelfth grade. The defendant stated that he can read, write, and understand the English language. The defendant stated that he was fully aware of the nature of the charges against him and the consequence of pleading guilty to those charges. The defendant further testified that he was not under the influence of alcohol, medicine, or any drug. Defendant stated that he had no other physical or mental condition which impaired his ability to understand the nature of the proceedings being held.

The defendant testified that he had received a copy of the Indictment pending against him and that he had fully discussed the charges therein, and his case in general, with his counsel. He also testified that he had read the plea agreement in its entirety and had discussed the plea agreement with his counsel before signing the agreement. He stated that he understood the terms of the agreement and that the document presented to the court set forth his agreement with the government in its entirety. The defendant specifically testified that he understood that under the terms of the agreement he was waiving rights to appeal or to collaterally attack his conviction or sentence. The defendant stated he was aware that the government had reserved its right to appeal sentencing guidelines issues. The defendant agreed that he was waiving his right to have a jury determine beyond a reasonable doubt the facts alleged in Count One, including any facts related to sentencing. Defendant's counsel stated that he had reviewed each of the terms of the plea agreement with the defendant and was satisfied that he understood those terms.

---

[1]Defense counsel informed the court that he had drafted a plea agreement which contained the same terms as the plea agreement proposed by the government. The undersigned informed the parties that the government's plea agreement was the only plea agreement that the court would recognize.

2

Case 5:06-cr-00029-GEC    Document 236    Filed 02/02/07    Page 2 of 13    Pageid#: 522

The defendant stated that he was pleading guilty of his own free will because he was, in fact, guilty of the offense charged. The defendant also stated that no one had made any promises other than those contained in his agreement with the government, or made any assurances or threats to him in an effort to induce her plea. The defendant testified that he understood that the offense with which he is charged is a felony and that, if his plea is accepted, he will be adjudged guilty of that offense. Moreover, the defendant testified that he understood he will be required to pay a mandatory assessment of $100 and that, at the discretion of the court, he may also be denied federal benefits, as that term is defined in 21 U.S.C. § 862(a), for a period of years or indefinitely, as set forth in the plea agreement. The defendant acknowledged that he consented to the administrative forfeiture, official use and/or destruction of any illegal firearms or contraband seized by any law enforcement agency from his possession or from his direct or indirect control. The defendant further acknowledged that he consented to forfeit any right, title and interest he has in assets purchased with proceeds of his illegal activity, directly or indirectly and that such a forfeiture of property is proportionate to the degree and nature of the offense he committed and does not raise any of the concerns addressed in *United States v. Austin*, 113 S.Ct. 2801 (1993). The defendant stated that he was waiving his right to raise the defense of the statute of limitations if for any reason the plea agreement is withdrawn or otherwise not consummated. The defendant stated that he understood that he must submit to the government a complete and truthful financial statement revealing all his assets and liabilities on a form provided by the government within 30 days of the date of the plea agreement. The defendant also testified that he was waiving all rights under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution

3

of his case.

The defendant was informed that the maximum possible penalty provided by law for Count One is life imprisonment and a $4,000,000 fine. The defendant was also informed that the mandatory minimum sentence for Count One is ten years imprisonment. The defendant was informed that maximum possible penalty for the lesser included offense of Count One of the Indictment is a $2,000,000 fine and/or forty years imprisonment. The defendant was informed that the lesser included offense of Count One of the Indictment carries a mandatory minimum sentence of five years imprisonment. Finally, defendant was informed that his assets might be subject to forfeiture.

The defendant was informed that under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow in determining the sentence in a criminal case. The defendant was then informed that, in light of the United States Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738 (2005), the sentencing guidelines are no longer mandatory but that the sentencing judge may apply them in an advisory fashion in determining a reasonable sentence. The defendant testified that he and his counsel had discussed how the sentencing guidelines might apply in his case. The defendant also testified that he understood that the court would not be able to determine the applicable guideline range, for advisory purposes, until after a presentence report had been prepared and both parties had been given an opportunity to challenge the reported facts and the application of the guidelines. He stated that he understood that the eventual sentence imposed may be different from any estimate his attorney had given him and that the court has the authority to issue a sentence that is either higher or lower than that called for by the guidelines, so long as the sentence is not greater than the statutory maximum for the offense

4

to which the defendant is pleading guilty.

The defendant stated that he understood that, contingent upon his acceptance of responsibility and continued cooperation in the sentencing process, and fulfillment of his duties under the plea agreement, the government will recommend a two-level (2) reduction under USSG § 3E1.1(a) for acceptance of responsibility, and because he meets the listed criteria, the government agrees that he should be granted an additional one-level (1) reduction under USSG § 3E1.1(b). Defendant testified he and the government had agreed that for purposes of USSG §§ 2D1.1 and 1B1.3, he should be held responsible for the drug weight as determined by the court. The defendant stated that he was aware that pursuant to the sentencing guidelines the sentencing judge could add or subtract up to four sentencing points to his sentencing level based upon his role in the offense, and defendant informed the court that he and the government had stipulated that his base offense level would not be increased or decreased based upon his role in the offense based on USSG §§ 3B1.1 and 3B1.2. The defendant also stated that he understood that the government is under no obligation to file a motion for substantial assistance, but that to the extent the government does exercise such discretion in this regard, he must provide such assistance in a manner set forth in the plea agreement. The defendant stated that he understood that a determination as to whether he had provided "substantial assistance" was a matter within the discretion of the United States Attorney's Office. The defendant stated that he knew that parole had been abolished and that if he is sentenced to prison he will not be released on parole but on supervised release, a violation of which could result in additional incarceration. The defendant stated he understood that any information given by him during a proffer or cooperation would not be used against him to enhance his sentence under USSG § 1B1.8.

The defendant testified that he understood that he had the right to a trial by a jury, in addition

5

to the following rights, which will be waived or given up if his guilty plea is accepted:

1. The right to plead not guilty to any offense charged against him;
2. The right at trial to be presumed innocent and to force the government to prove his guilt beyond a reasonable doubt;
3. The right of assistance of counsel at trial and in any subsequent appeal;
4. The right to see, hear and cross-examine witnesses;
5. The right to call witnesses to testify in his own behalf and to the issuance of subpoenas or compulsory process to compel the attendance of witnesses;
6. The right to decline to testify unless he voluntarily elected to do so in his own defense;
7. The right to a unanimous guilty verdict; and
8. The right to appeal a guilty verdict.

The defendant also testified that he understood that if he is adjudged guilty of the charges against him, he may be deprived of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a firearm.

The defendant stated that he was fully satisfied with the advice and representation given to him in this case by his counsel. The defendant testified that he understood the possible consequences of his plea and the consequences of breaching any term of the plea agreement. The defendant asked the court to accept his plea of guilty to a lesser included offense of Count One of the Indictment.

## THE GOVERNMENT'S EVIDENCE

The defendant waived his right to have the government's Factual Summary read in open court and had no objection to the Summary. The Factual Summary having been filed in open court, the evidence presented therein regarding the offense charged is as follows:

### THE CONSPIRACY (Count One)

This conspiracy started in the Fall of 2005 when Mark Schroeder started purchasing crack on the streets of N.E. Washington, D.C. and continued until the arrest of Rayvon Brown and Alvin Jerome Lucas on June 6 & 7, 2006. During the period of early February 2006 until June 2006 Rayvon Brown,

6

with the assistance of those at his direction, brought 1-2 ounce quantities of cocaine base "crack", from Washington D.C. to Sperryville and Luray, Virginia, 2-3 times per week for distribution and redistribution. The estimated cumulative weight attributable to this conspiracy is a minimum of 896 grams of crack cocaine (based on 16 weeks at one ounce 2 times per week = 32 ounces x 28 grams per ounce) and a maximum of 2688 grams (based on 16 weeks at two ounces three times per week = 96 ounces x 28 grams per ounce).

The individual roles of the defendants in this conspiracy are as follows:

1. **RAYVON GREGORY BROWN, a.k.a. "Ray Ray"**

Rayvon Brown is the leader, organizer and manager of this crack cocaine distribution conspiracy that involved more than 10 persons. Brown recruited Lucas to function as his enforcer. Brown directed Lucas' activities within the conspiracy. He also paid Lucas for Lucas' services with quantities of crack for Lucas' personal consumption. Brown negotiated with Mark Schroeder to set up a crack distribution operation in Page County, Virginia. Brown maintained a source for the crack in Washington, D.C. and either transported or directed the transportation of the crack to Page County. He directed who would be involved in the breaking down and repackaging of the crack for resale. Brown directed other members of the conspiracy in sales of crack and determined who would hold his drugs and firearms until he would return from his regular trips to Washington, D.C. Included in the list of those members of the conspiracy to which Brown occupied a supervisory position, in addition to those already described, are Sheila Schroeder, Amy McCorkle and Jerry McCorkle. Brown directed Mark Schroeder in the procurement of multiple firearms that were regularly used and carried by Brown, Lucas and Mark Schroeder during and in relation to this conspiracy. Brown also utilized violence, and the threat of violence that created an atmosphere of fear and intimidation in order to maintain his position

of control.

## 2. ALVIN JEROME LUCAS a.k.a. "Daniel Reeves" and "Chalupa"

Lucas was a crack addict from N.E Washington, D.C who was involved in low level crack selling to support his habit and existence. He was recruited by Brown to go with him to Page County to be involved in a crack distribution organization. Because of his size, he was to be an enforcer. As an employee of Brown he was paid in crack, not money. He was involved in holding the crack for Brown. Lucas would ride with Amy McCorkle when she would make deliveries. He would possess the firearms that were a constant part of this conspiracy and assist in counting the money, which were the proceeds of the crack distribution.

## 3. MARK GLENN SCHROEDER

Mark Schroeder is the pivotal player in this conspiracy. Mark was a crack addict who knew N.E. Washington, D.C. drug dealers, that he had met in prison. He eventually hooked up with Brown and Lucas and became involved in the systematic trafficking of crack from D.C to Page County, where it was distributed and redistributed. Mark involved his girlfriend, and later his wife, Sheila Schroeder, as well as his daughter Amy McCorkle and her husband, Jerry McCorkle, in this conspiracy. Among Mark's functions involved in trafficking from D.C. to Page County, were to personally make numerous distributions of crack; to assist in obtaining multiple firearms for use within the conspiracy; and to assist in the bagging of crack, until Brown discovered how much crack Mark was stealing during the process.

## 4. SHEILA ELIZABETH SCHROEDER

Sheila Schroeder's role within this conspiracy is largely defined by her addiction to crack and her relationship, first as a girlfriend and then as a wife, to Mark Schroeder. Her activities in the conspiracy included primarily to accompany and assist Mark on multiple trips to the Washington, D.C,

8

area to bring drugs back to Page County; and to aid an abet Mark as he made his distributions. However, Sheila also made distributions herself, on occasion.

5. **AMY RENEE McCORKLE**

Amy McCorkle is the daughter of Mark Schroeder and the wife of Jerry McCorkle. Amy's involvement in this case is several fold. In February 2006, Amy had been entrusted with a house in Sperryville, Virginia. The regular resident of that house was in jail. Amy allowed the conspiracy to operate out of that house for a period of time. This house is where the crack was broken down and repackaged for re-sale. Also, this home is where numerous distributions took place and where many deliveries originated from. Amy was involved in obtaining crack cocaine on numerous occasions from other members of the conspiracy and in turn selling the crack to other dealers and customers. Amy was aware that firearms played a role in this conspiracy and had actual knowledge that Brown and Lucas carried guns. Amy, on least one occasion, traveled with Mark to Maryland to bring back a quantity of crack from Brown's source of supply. Amy would, on multiple occasions, rent motel rooms in her name for Brown and others to sell crack out of.

6. **JERRY WAYNE McCORKLE, II**

Jerry McCorkle is the husband of Amy McCorkle. Jerry is a long-term drug addict. His activities within the conspiracy include packaging crack for resale at the house in Sperryville; making distributions of crack himself; and accompanying and assisting Amy in her distributions of crack.

7. **LORENZO ABNEY, a/k/a "Smiley"**

Abney was a street level crack dealer in the Corcoran Avenue area of N.E. Washington, D.C. He had known and sold crack cocaine to Mark Schroeder for about one year in N.E. D.C. In early 2006, Abney was recruited by Brown to sell crack cocaine in Sperryville and Luray, Virginia. Both Abney

9

or Brown, would bring the crack from D.C. to Virginia for distribution. After only a few weeks, during February 2006, Abney became inactive in the conspiracy as he was in a Court Ordered Residential Drug Rehabilitation Program in Washington, D.C. Upon release from that program on April 19, 2006, Abney rejoined his co-conspirators in their crack trafficking operation between D.C. and Virginia. This continued until the arrest of Brown and Lucas on June 6 & 7, 2006. Abney also participated in the distribution/sale of crack cocaine to a confidential informant as charged in Count 10 of the Superseding Indictment. This sale occurred on April 25, 2006, six days after being released from drug treatment.

### 8. DONALD SKINNER

Donald Skinner was on the low end of this conspiracy. He was a user/distributer. He would come to the point of distribution two to three times per week and obtain 1-2 grams each time. Skinner, in turn, would sell some of the crack so he could buy additional amounts of crack. Skinner would on many occasions accompany and assist Mark Schroeder in making deliveries of crack cocaine. Skinner would be paid in crack by Schroeder for his assistance. The evidence is that this defendant, as a part of his participation in this conspiracy, had direct involvement with more than five grams of crack cocaine and that he had actual knowledge that the conspiracy was involved in greater than 35 grams of crack cocaine.

### 9. YVETTE M. JACKSON

Yvette Jackson is a long-term crack cocaine user who has allowed various crack dealers to operate out of her house in exchange for being given crack for her consumption. Jackson's role in this conspiracy is exactly that. She knowingly provided one of the venues that Brown and other conspirators conducted their crack trafficking activities in exchange for crack to smoke. Jackson was also a regular customer of this conspiracy. The evidence is that this defendant, as a part of her participation in this

10

conspiracy, had direct involvement with more than five grams of crack cocaine and that she had actual knowledge that the conspiracy was involved in greater than 35 grams of crack cocaine.

### 10. ANTHONY WADE GOOD, a/k/a "Tony"

Anthony Good's role in the conspiracy was that of a distributor and user of crack cocaine. He was Mark Schroeder's biggest customer. On occasion, Tony would be supplied with 1/4 ounce (7 grams) quantities of crack by Schroeder and Brown two to three times per week. Good had his own customers. At other times, Tony would purchase 1 to 1-1/2 gram amounts for use and redistribution several times a day. Schroeder stated that he sold to Good an estimated 150-200 occasions. The evidence is that this defendant, as a part of his participation in this conspiracy, had direct involvement with more than five grams of crack cocaine and that he had actual knowledge that the conspiracy was involved in greater than 35 grams of crack cocaine.

### 11. JENNIFER TURLEY TUMBLIN

Jennifer Turley Tumblin's role was as a user/seller/deliverer. Turley stated in her post-arrest Mirandized statement that she made multiple deliveries of crack cocaine to customers and other members of the conspiracy for Mark Schroeder. Turley-Tumblin would obtain multiple grams of crack from various other members of this conspiracy on average of four times per week. Turley-Tumblin would sell some and use some crack and distribute some of the crack to her husband, who is also addicted to crack. On occasions, Turley-Tumblin would sell crack on commission for Brown. During these times, she would go by the house several times per day to get crack. Turley-Tumblin would receive one gram of crack for every five grams she sold. The evidence is that this defendant, as a part of her participation in this conspiracy, had direct involvement with more than five grams of crack cocaine and that she had actual knowledge that the conspiracy was involved in greater than 35 grams

of crack cocaine.

**FINDINGS OF FACT**

Based on the evidence presented at the plea hearing, the undersigned now submits the following formal findings of fact, conclusions and recommendations:

1. The defendant is fully competent and capable of entering an informed plea;
2. The defendant is aware of the nature of the charges and the consequences of his plea;
3. The defendant knowingly and voluntarily entered a plea of guilty to a lesser included offense of Count One of the Indictment; and
4. The evidence presents an independent basis in fact containing each of the essential elements of the offense to which the defendant is pleading guilty.

**RECOMMENDED DISPOSITION**

Based upon the above findings of fact, the undersigned RECOMMENDS that the court accept the defendant's plea of guilty to a lesser included offense of Count One of the Indictment and adjudge him guilty of that offense. The undersigned further DIRECTS that a presentence report be prepared. A sentencing hearing hereby is scheduled for April 23, 2007 at 12:00 p.m. before the presiding District Judge in Harrisonburg.

**NOTICE TO PARTIES**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C): Within ten days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. The presiding District Judge shall make a *de novo* determination of those portions of the report or specified

proposed findings or recommendations to which objection is made. The presiding District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the undersigned. The judge may also receive further evidence or recommit the matter to the undersigned with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk is hereby directed to send certified copies of this Report and Recommendation to all counsel of record.

ENTERED: *[signature]*
United States Magistrate Judge

2-2-2007
Date